IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MELISSA P. NONEMAKER, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO. 06-01960 |
| v. | : | |
| | : | |
| JO ANNE B. BARNHART, | : | |
| Commissioner of Social Security, | : | |
| | : | |
| Defendant. | : | |

Giles, J.                                                                                    February 16, 2007

**MEMORANDUM**

**I.      Introduction**

Melissa Nonemaker brings this action under 42 U.S.C. §§ 405(g) and 1393(c)(3) seeking reversal or, in the alternative, remand of the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff's claim for Social Security Disability Insurance ("SSDI") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 401 et seq. and 1381 et seq.  Plaintiff and Defendant have each filed a Motion for Summary Judgment.  For the reasons that follow, summary judgment is entered in favor of Plaintiff and this matter is remanded to the Commissioner for further proceedings consistent with this order and memorandum.

**II.     Standard of Review**

When a district court reviews a decision of the Commissioner, review is limited to the

Commissioner's final decision. 42 U.S.C. § 405(g); <u>Podedworny v. Harris</u>, 745 F.2d 210, 217 (3d Cir. 1984). If the Commissioner's decision is supported by substantial evidence, the decision must be upheld, even if this court would have reached a different conclusion. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). Substantial evidence has been defined as "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion." <u>Consol. Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938). In this context, substantial evidence is more than mere scintilla, but may be somewhat less than a preponderance of the evidence. <u>Ginsburg v. Richardson</u>, 436 F.2d 1146, 1148 (3d Cir. 1971). Review of "an agency's interpretation of legal precepts, as demonstrated by its application of such precepts to the facts," is plenary. <u>Monsour Med. Ctr. v. Heckler</u>, 806 F.2d 1185, 1191 (3d Cir. 1986).

**III.   Discussion**

To establish eligibility for SSDI and SSI, a plaintiff has the burden to show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A) (2002). To determine disability, the Social Security Administration applies a five-step test.[1] 20 C.F.R. § 416.920. The Administrative Law Judge ("ALJ") found that: (1)

---

[1] The Third Circuit describes the five steps and the burden for each as follows: "Step one requires a determination of whether the claimant is currently engaging in 'substantial gainful activity[.]' . . . Step two of the evaluation process requires that the claimant show that he suffers from a 'severe impairment.' . . . Step three allows the claimant to demonstrate that his disability meets or equals an impairment listed in Appendix 1 to Subpart P of Part 404[.] . . . At this step, an ALJ often enlists the help of an expert to explain the medical evidence. If the impairment meets or equals a listed impairment, the claimant is considered disabled per se and the evaluation

Plaintiff had not engaged in substantial gainful activity; (2) her mood disorders and congenital nystagmus were "severe"; (3) these impairments did not meet or equal the listings; (4) Plaintiff's allegations regarding her limitations were not totally credible; (5) she was unable to perform any of her past relevant work; and, denying her at step five, (6) that she had the residual capacity to perform a significant range of medium work, entailing lifting and carrying 50 pounds occasionally and 25 pounds frequently, such as sorter/grader, housekeeper/cleaner, and janitorial work. (R. 22-23.)

Plaintiff appeals the decision of the ALJ alleging a number of errors, including that the ALJ erred: (1) in failing to find that Plaintiff's developmental disabilities were a severe impairment; (2) in failing to consider whether Plaintiff's borderline intelligence equaled the requirements of listing 12.05C, 20 C.F.R. Pt. 404, Subpt. P, App. I, § 12.05C, and to enlist the aid of a medical expert in determining equivalence; (3) in reaching a conclusion about Plaintiff's residual functional capacity without considering evidence that she was not capable of sustaining employment without accommodations; and (4) in failing to provide an explanation for rejecting the subjective testimony of Plaintiff and her mother. The Commissioner counters that the ALJ's decision is well-supported and should be upheld. Upon careful review of the entire record, the court concludes that there were several deficiencies in the ALJ's decision-making process,

---

process ends. If, however, the claimant's impairments do not satisfy step three, the claimant must continue on to step four [which] . . . requires that the claimant demonstrate he does not have sufficient residual capacity to perform his past relevant work. Residual functional capacity is defined as 'what a claimant can do despite his limitations.' . . . [If step four is met], the inquiry moves to step five . . . [in which] the burden shifts to the Commissioner to show that the claimant can perform 'other work.' 'Other work' must consist of jobs that exist in significant numbers in the national economy that the claimant can perform given his age, education, past work experience, and residual functional capacity." Burns v. Barnhart, 312 F.3d 113, 118-19 (3d Cir. 2002) (citations omitted).

requiring remand for proceedings consistent with this opinion.

### A. The ALJ erred in failing to include a finding that Plaintiff's developmental disabilities were severe.

The requirement in step two to show that the claimant has a severe impairment is a de minimus threshold inquiry, in which the claimant "need only demonstrate something beyond 'a slight abnormality or combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work.'" McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 360 (3d Cir. 2004) (quoting SSR 85-28, 1985 WL 56856, at *3 (1985)[2]). The Commissioner must consider all of a claimant's impairments in combination because the combined effect of impairments may be critical in determining whether a disability exists. 20 C.F.R. § 404.1523; SSR 96-8p, 61 Fed. Reg. 34,477 (July 2, 1996). Also, the ALJ must explicitly weigh all of the evidence, including that which supports a claimant's claims, and, if he chooses to reject a significant piece of evidence when faced with conflicting evidence, he must explain his reasons for doing so. Fargnoli v. Halter, 247 F.3d 34, 40 (3d Cir. 2001); Sykes v. Apfel, 228 F.3d 259, 266 n.9 (3d Cir. 2000) (quoting Benton v. Bowen, 820 F.2d 85, 88 (3d Cir. 1987)).

The Commissioner concedes that the ALJ omitted borderline intellectual functioning from the listed impairments in its findings. The Commissioner, however, argues that the ALJ acknowledged Plaintiff's borderline intellectual functioning in the body of his decision (R. 17-

---

[2] Social Security Rulings (SSR) are binding on the agency once published. Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 546 (3d Cir. 2003).

18) and relied on two medical sources, who, the Commissioner argues, acknowledged Plaintiff's learning disability (R. 189, 207).

      The ALJ erred as a matter of law in failing to consider in his findings whether Plaintiff's borderline intellectual functioning was severe and in failing to consider her borderline intellectual functioning in combination with other impairments in determining whether a disability exists.  That the ALJ discussed Plaintiff's borderline intellectual functioning in the body of his decision is irrelevant.  Without explicit findings, explicit reasons for each finding, and a clear statement of the evidence relied upon, a court is deprived of any means for meaningful review.  Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119-20 (3d Cir. 2000).

      A finding that Plaintiff's borderline intellectual functioning is not a severe impairment would be an error of law and fact.  The record contains uncontradicted evidence that, at age fourteen, tests showed Plaintiff had a verbal IQ of 85, performance IQ of 71, and full scale IQ of 76, placing her in the borderline range of intelligence.  (R. 166.)  When she was seventeen and in twelfth grade, tests showed Plaintiff had a verbal IQ of 76, a performance IQ of 73, and full scale IQ of 72, placing her in the borderline range of intellectual functioning; was in the 0.7th percentile in the Beery-Buktenica Test of Visual Motor Integration; had an age equivalent of eight years old on the Bender Visual Motor Gestalt Test; and had a ninth grade basic reading ability, eighth grade spelling level, seventh grade reading comprehension level, and a fourth to fifth grade math level.  (R. 166-68.)  She performed well below her grade level.  (R. 166-69.)  Her low intellectual abilities may be connected to fetal alcohol syndrome at birth.  (See, e.g., R. 17, 177.)

Although Plaintiff completed high school, it is clear from the record that she did so only with extensive special education accommodations, which, through some general classroom participation, seems to have emphasized her social, rather than academic, integration. (R. 164-70, 308-09.) Although the ALJ states that Plaintiff had taken college courses (R. 16), the record shows contradictory evidence, unreconciled by the ALJ, that Plaintiff took a few non-credit, pre-college preparatory courses and dropped out of them because of their difficulty (R. 314).

Based on extensive testing, Dr. Paul Haughton, Psy.D, opined that Plaintiff had pronounced weaknesses in visual-motor-spatial coordination, perceptual organization, and the ability to analyze and synthesize spatial relations. (R. 166-68.) She reportedly gave up quickly, became exasperated or frustrated, and cried when faced with tasks that were difficult for her. (R. 166-67.) As for her attentional skills and auditory memory, he reported that Plaintiff needed information to be presented orally and slowly to her, with repetition and without distractions, such as one-on-one in a small, quiet room, as opposed to in a classroom setting. (R. 168.)

The evidence in the record suggests that Plaintiff's borderline intellectual functioning would have more than a minimal effect on her ability to work. See McCrea, 370 F.3d at 360. It would be error to find that her borderline intellectual functioning does not meet at least the de minimus requirement for severe impairment.

Additionally, the ALJ erred as a matter of law in failing to consider all of the evidence and explain why weight was not given to Dr. Haughton's report. See Fargnoli, 247 F.3d at 40; Sykes, 228 F.3d at 266 n.9 (quoting Benton, 820 F.2d at 88). The two reports upon which the Commissioner argues the ALJ relied in his findings do not mention of Plaintiff's borderline intellectual functioning or the tests conducted by Dr. Haughton, their results, and his findings.

The report by Dr. Roslyn Wolberg, Psy.D, contains only a passing reference to Plaintiff's participation in a learning disabled program (R. 189) and the report by Dr. Sidney D. Segal, Ed.D, contains only a handwritten notation of "LD," for learning disabled, in the consultant's notes section (R. 207). "An ALJ cannot reject IQ scores based on personal observations of the claimant and speculative inferences drawn from the record." Morales v. Apfel, 225 F.3d 310, 318 (3d Cir. 2000); see Markle v. Barnhart, 324 F.3d 182, 187 (3d Cir. 2003) (finding that, although an ALJ may reject IQ scores that are inconsistent with the record, the ALJ erred when he relied on an opinion that did not consider IQ scores and where no expert opinion contradicted the IQ findings). Because these two reports do not address Plaintiff's borderline intellectual functioning or contradict findings in the Haughton report, they cannot reasonably be relied upon exclusively in determining whether Plaintiff's borderline intellectual functioning is a severe impairment and whether, when considered in combination with other impairments, she is disabled.

### B. The ALJ erred in failing to consider whether Plaintiff's borderline intelligence equaled the requirements of listing 12.05C.

At step three, the ALJ erred in failing to consider whether Plaintiff's borderline intellectual functioning equaled the requirements of listing 12.05C for mental retardation and to call upon a medical expert to assess whether equivalence was met. Section 12.05 defines mental retardation as "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Pt. 404, Subpt. P. App. I, § 12.05.

It is undisputed that the onset age requirement is met. Adaptive functioning or behavior "refers to the individual's progress in acquiring mental, academic, social and personal skills as compared with other unimpaired individuals of his/her age. Indicators of adaptive behavior include childhood developmental milestones . . . , as well as educational and social achievements." POMS, Section DI 24515.056 D.2. The significant gap in performance at grade level – over seven years in some subjects – between Plaintiff and her peers, as revealed by testing and demonstrated by extensive special education accommodations afforded her (R. 167-68), is consistent with a deficit in adaptive functioning. The same holds true with respect to the results of various visual-motors tests administered. One showed that Plaintiff, at age seventeen, had an age equivalent of eight years old. (R. 167.)

Mental retardation is established under 12.05C if there is a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P. App. I, § 12.05C. The Commissioner construes the latter part of 12.05C to "mean that the other impairment is a 'severe' impairment as defined in §§ 404.1520(c) and 416.920(c)." Markle, 324 F.3d at 188 (quoting Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50,746, 50,772 (Aug. 21, 2000)).

In cases where verbal, performance, and full scale IQs are provided by testing, the Commissioner uses the lowest of these three scores in conjunction with 12.05. Burns v. Barnhart, 312 F.3d 113, 124 (3d Cir. 2002); 20 C.F.R. Pt. 404, Subpt. P, App. I, § 12.00D(6)(c). Thus, the IQ numbers at issue here are Plaintiff's performance IQ of 71 when she was fourteen and her full scale IQ of 72 when she was seventeen, placing her just shy of the score of 70

required to meet listing 12.05C. (R. 166-67.) Plaintiff does not argue that listing 12.05C is met, but rather that her impairments are equivalent to 12.05C.

For equivalence, "the set of symptoms, signs and laboratory findings in the medical evidence supporting a claim must be compared with, and found to be equivalent in terms of medical severity and duration to, the set of symptoms, signs and laboratory findings specified for a listed impairment." SSR 86-8; see Sullivan v. Zebley, 493 U.S. 521, 531 (1990). The applicable Programs Operations Manual System (POMS),[3] states that "slightly higher IQs (e.g., 70-75) in the presence of other physical or mental disorders that impose additional and significant work-related limitation of function may support an equivalence determination. . . . [G]enerally the higher the IQ, the less likely medical equivalence in combination with another physical or mental impairment(s) can be found." POMS, Section DI 24515.056 D.1.c. Plaintiff's lowest IQ scores of 71 and 72 certainly fall within the range contemplated by the POMS for equivalence.[4] Because her IQ scores are at the low end of the range, it is more likely that medical equivalence in combination with other impairments will be found.

Where the medical evidence suggests that a finding of medical equivalence to a listing is reasonable, the ALJ should enlist the aid of a medical expert as to equivalence. 20 C.F.R. § 416.912(b)(6); SSR 96-6p, Fed. Reg. 34,468 (July 2, 1996) (requiring an updated opinion from a

---

[3] POMS are guidelines that do not have the force of law, but may have persuasive force in interpreting agency regulations or be viewed as binding on an ALJ where a matter is squarely covered by its provisions. Schweiker v. Hansen, 450 U.S. 785, 789 (1981); 70A Am. Jur. 2d Soc. Sec. & Medicare § 17 (2006).

[4] The inquiry into whether 12.05C is equaled pursuant to the POMS is permitted and is distinct from reading a five-point margin of error into the regulation, which is prohibited by the Third Circuit. See Burns, 312 F.3d at 125-26.

medical expert where "symptoms, signs, and laboratory findings reported in the case suggest that a judgment of equivalence may be reasonable"). The ALJ found at least two other severe impairments, the Plaintiff's mood disorders and congenital nystagmus (R. 23), which constitute impairments "imposing additional and significant work-related limitations of function" under 12.05C and the POMS. See Markle, 324 F.3d at 188. Given that Plaintiff's IQ scores fall within the low end of the range in the POMS, that the onset age requirement is satisfied, and that she has other severe impairments and deficits in adaptive functioning, there is a reasonable basis for a finding of equivalence as to listing 12.05C. The Court remands this matter to the Commissioner with instructions to conduct further proceedings and engage the services of a competent medical expert to give testimony on the issue of equivalence.

## C. The ALJ's Residual Functional Capacity finding was not supported by substantial evidence.

Regarding step four, the ALJ's finding as to Plaintiff's residual functional capacity ("RFC") was deficient because he failed to incorporate Plaintiff's borderline intellectual functioning.[5] Thus, the ALJ's RFC finding was not supported by substantial evidence.

---

[5] Even if the ALJ had considered Plaintiff's borderline intellectual functioning, the finding would still be deficient because the hypothetical question that the ALJ asked the vocational expert regarding Plaintiff's residual functional capacity improperly failed to incorporate Plaintiff's borderline intellectual functioning. See Burns, 312 F.3d at 122. "Where there exists in the record medically undisputed evidence of specific impairments not included in a hypothetical question to a vocational expert, the expert's response is not considered substantial evidence." Id. at 123 (citing Podedworny, 745 F.2d at 218). In borderline intellectual functioning cases, the hypothetical question must convey with specificity all of the borderline aspects of a claimant's intellectual functioning or other deficiencies. Id.
  Here, the ALJ prefaced the hypothetical question to the vocational expert with a description of a "work environment of a simple, routine, repetitive nature where she would not

In addition, the RFC was not supported by substantial evidence because, although it included exertional limitations, it failed to include other non-exertional limitations that the ALJ had adopted in his evaluation of the evidence. An ALJ must state both exertional and non-exertional limitations in the RFC assessment. Allen v. Barnhart, 417 F.3d 396, 404-405 (3d Cir. 2005). Specifically, the ALJ recognized that Plaintiff was "moderately limited in her ability to carry out detailed instructions, maintain attention and concentration, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, and to travel in unfamiliar places and/or use public transportation." (R. 19.) Yet, the ALJ's RFC finding does not reconcile these non-exertional limitations.

---

have to deal with the public, and recognizing that any job requires productivity, still on the lower end of it, productivity and pace environment." (R. 334.) The Third Circuit has recognized that the phrase "simple, routine, repetitive work" may account for the specific deficiencies of "concentration, persistence, and pace," but does not sufficiently describe other identified deficiencies, such as "borderline in the areas of reliability, common sense, ability to function independently, and judgment, or . . . flightiness, disassociation, oppositional tendencies, and difficulties in comprehension." Burns, 312 F.3d at 124 (citing Howard v. Massanari, 255 F.3d 577 (8th Cir. 2001)); see Ramirez v. Barnhart, 372 F.3d 546, 552-55 (3d Cir. 2004). The expert report at issue in Burns specifically found, among other things, that the claimant exhibited "developmental delay and psychomotor functioning, [and] some problems in integration." Burns, 312 F.3d at 121. Like in Burns, in evaluating Plaintiff's borderline intellectual functioning, the Haughton report identified several deficiencies not addressed in the ALJ's hypothetical. These deficiencies include: borderline range of ability for verbal and non-verbal reasoning skills; extreme discrepancy in grade-level performance (i.e., developmental delay); visual-motor-spatial coordination; perceptual organization; analyzing and synthesizing spatial relations; integration; and giving up quickly, crying, and being frustrated on tasks that were difficult for her. (R. 166-69.) The ALJ did not capture all of Plaintiff's impairments or their limitations in his hypothetical to the vocational expert. Upon remand, the ALJ should consider and include with specificity all of the deficiencies associated with Plaintiff's borderline intellectual functioning.

The ALJ also erred when he failed to consider post-hearing evidence from the Office of Vocational Rehabilitation (OVR) and A.P. Orleans Vocational Center and to explain why weight was not given to this evidence in his findings.  The OVR and A.P. Orleans evidence conflicts in part with Plaintiff's claims, in that it states that Plaintiff worked well on the majority of work samples, worked diligently, and was work ready.  (R. 279.)   Yet, this evidence supports Plaintiff's claims, in part, in that it states that Plaintiff was "most significantly disabled," frequently gave up on tasks, did not do well with written instructions, had difficulty with math tasks, and would benefit from a job coach.  (R. 122, 276-77, 279.)  Because the ALJ must explicitly weigh evidence that supports a claimant's claims and explain his reasons for rejecting such evidence, the ALJ erred in failing to do so regarding the OVR and A.P. Orleans evidence.  See Fargnoli, 247 F.3d at 40; Sykes, 228 F.3d at 266 n.9 (quoting Benton, 820 F.2d at 88).

        **D.**       **The ALJ's credibility assessment was not supported by substantial evidence.**

Plaintiff argues that the ALJ erred in rejecting the subjective testimony of Plaintiff and her mother.  To be credible, subjective symptoms must bear some relationship to a claimant's physical, mental, or psychological status, as demonstrated by objective medical findings, diagnoses, and opinions.  See Baerga v. Richardson, 500 F.2d 309, 312 (3d Cir. 1974); 20 C.F.R. §§ 404.1526, 404.1529, 416.926, 416.929.  An ALJ may discredit a claimant's subjective complaints when: (1) there is contradictory medical evidence in the record, and (2) the ALJ explains the basis for rejecting the complaints.  See Mason v. Shalala, 994 F.2d 1058, 1067-68 (3d Cir. 1993).  If medical signs or laboratory findings show that claimant has a medically determinable impairment that could produce pain, the ALJ must consider all available evidence,

including claimant's statements, to determine whether and how the symptoms limit claimant's capacity to work. See 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1); SSR 96-7p, 61 Fed. Reg. 34,483, 34,484 (July 2, 1996) (requiring that a credibility finding be "sufficiently specific to make clear . . . to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight"). In evaluating credibility, relevant factors include: Plaintiff's daily activities; the location, duration, frequency, and intensity of Plaintiff's symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication; treatment or measures, other than medication, Plaintiff receives or has received for relief of symptoms; and other factors concerning functional limitations and restrictions due to symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 96-7p, 61 Fed. Reg. at 34,484; see Alvarez v. Sec'y of Health and Human Serv., 549 F. Supp. 897, 899-900 (E.D. Pa. 1982).

  In his findings, the ALJ states that Plaintiff's allegations were "not totally credible for the reasons set forth in the body of the decision." (R. 23.) Only a few short paragraphs in the ALJ's decision describe the testimony of Plaintiff and her mother. (R. 16-17.) The ALJ's findings do not address the testimony of Plaintiff's mother or explain why her testimony was not considered in the findings. The only mention of Plaintiff's credibility in the body of the decision is the credibility assessment of Dr. Segal, who found Plaintiff partially credible. (R. 20.) It would appear that the ALJ adopted Dr. Segal's assessment without making his own determination.

  If the ALJ did merely adopt Dr. Segal's assessment of Plaintiff's credibility, the court finds that this procedure is not "sufficiently specific to make clear . . . to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that

weight." See SSR 96-7p, 61 Fed. Reg. at 34,484.  An ALJ may not direct a reviewing body to sift through the body of a decision in search of his reasons for a credibility finding, only to force the reviewer to engage in guesswork.  To do so would deprive a court of any means for meaningful review.  See Burnett, 220 F.3d at 119-20.

**IV.     Conclusion**

The ALJ's determination that Plaintiff was not disabled during the relevant time period and that Plaintiff had the capacity to perform a significant range of medium work is not supported by substantial evidence.  Accordingly, Plaintiff's motion for summary judgment is granted and Defendant's motion is denied.  This matter is remanded to the Commissioner to:

(1)  consider whether Plaintiff's borderline intellectual functioning was severe;

(2)  consider her borderline intellectual functioning in combination with other impairments in determining whether a disability exists;

(3)  properly consider all of the evidence, and, if weight is not given to any particular evidence, explain why;

(4)  consider whether Plaintiff's borderline intellectual functioning equals the requirements of listing 12.05C for mental retardation and call upon a medical expert to assess whether equivalence is met;

(5)  in light of any new conclusions, re-evaluate Plaintiff's RFC and present to the vocational expert all credible limitations with specificity, including Plaintiff's borderline intellectual functioning; and

(6)  consider the subjective testimony of Plaintiff and her mother and provide a specific

explanation for credibility assessments.

      An appropriate order follows.